R. E. OLDS and TRUMAN H. NEWBERRY v.
DEAN ALVORD, *et al.*

191 So. 434
En Banc
For Former Opinions See 183 So. 711, 188 So. 652
Opinion Filed June 20, 1939

139 Florida 745. Disregard Per Curiam opinion beginning on page 755 and dissenting opinion by Mr. Justice Buford on page 758. Erroneously published. As a consequence also disregard headnotes 10, 11, 12, 13 and 14.

746

*Edgar John Phillips, Harry L. Thompson* and *J. Tweed McMullen,* for Appellants;

*McIlvaine & Milam,* for Appellants;

*Dickenson & Dickenson; Hull, Landis & Whitehair,* and *Storey, Thorndike & Dodge* (Boston, Mass.), as *amici curiae.*

PER CURIAM.—After the mandate had been recalled and a rehearing granted in this cause, by order of December 6, 1938, counsel for appellees on January 10, 1939, filed a motion, "to set aside and strike from its records the pretended order entered in said cause on December 6, 1938, whereby (1) the Clerk of the Circuit Court of Pinellas County was directed to return to the clerk of this Court the mandate theretofore issued in said cause; (2) the extraordinary petition of appellants for rehearing was attempted to be granted; and (3) the cause was directed to be sub-

mitted in due course,"—the grounds of the motion being stated.

On March 20, 1939, the Court made the following order in this cause:

"This cause having been submitted to the Court upon motion of counsel for appellees to set aside and strike from its record the order entered therein on December 6, 1938, which motion has been argued by counsel for the respective parties and duly considered by the Court, it is thereupon ordered by the Court that the above styled cause be set down for oral argument on the merits at 10:00 o'clock A. M., Monday, March 27, instant."

On June 1, 1939, counsel for appellees filed a motion "to cease reconsidering the said cause of its merits and desist from further reconsideration thereof, to set aside and strike from its records the order of December 6, 1938, made by three Judges only of this Honorable Court whereby a rehearing was attempted to be granted, and to return to the lower court the mandate of this Honorable Court heretofore issued."

One of the grounds of the motion is that "If this Honorable Court should reach the conclusion that the decree appealed from should be reversed, the Court would be without power to enter a decree of reversal since to do so would take the property of appellees—to-wit, the decree appealed from and the rights of the appellees thereunder—without due process of law, contrary to and in violation of Section 12 of the Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States, * * *."

The Court having duly considered said motions filed in this cause on January 10, 1939, and June 1, 1939, it is now ordered by the Court that each of such motions be and is hereby denied because the Court is evenly divided and the

motions could only be granted by the affirmative action of the majority of the Court participating in the disposition of such motions.

WHITFIELD, BROWN and BUFORD, J. J., concur.

TERRELL, CHAPMAN and THOMAS, J. J., dissent.

BROWN, J. (concurring).—This opinion deals with the jurisdictional question raised by the motion filed by the appellees on January 10, 1939, to strike the order of this Court rendered December 6, 1938, recalling the mandate and granting the extraordinary petition for rehearing on the merits, which had been filed on October 12, 1928; also the motions recently filed by appellees, on June 1st and 6th, respectively, asking the Court to desist from reconsideration of the cause; all of said motions of appellees being based upon the theory that this Court had lost jurisdiction of the case when the order of December 6, 1938, was entered, by reason of the fact that the Court had theretofore, on October 11, 1938, denied the petition for rehearing, which had been filed during the preceding (January) term, and the mandate had gone down on October 13, 1938, the contention being that this order of October 11, 1938, irrevocably terminated the jurisdiction of this Court.

The writer was very much impressed by the motion filed by appellees on January 10, 1939, and the arguments of able counsel in support of same, and gave the matter considerable study.

The original judgment of affirmance in this case was rendered on March 29, 1938, during the January term of that year. A petition for rehearing was duly filed which remained undisposed of at the end of that term. The Court entered its usual order continuing and carrying over into the June term of 1938 all pending causes and business before the Court which remained undisposed of. So this case was

carried over into the June term of 1938. Early in that term, on June 18, 1938, the petition for rehearing submitted during the preceding term was denied, but four days later such order of denial was vacated by this Court, thus leaving the petition for rehearing still pending undisposed of. On October 11, 1938, during the same term, the petition for rehearing was again considered and an order entered denying it, and two days later the mandate to the lower court was sent down. On October 12, 1938, an extraordinary petition for rehearing was filed, and a few days later a petition for the recall of the mandate was filed. On December 6, 1938, an order was made recalling the mandate, and granting a rehearing of the case on the merits, upon the second petition for rehearing.

Under the case of State *ex rel.* Davis v. City of Avon Park, 117 Fla. 556, 151 So. 701, there would have been no question about the retention of jurisdiction if the order of December 6, 1938, had contained a clause expressly vacating the previous order of October 11, 1938, but I am inclined to the opinion that in spite of this formal omission, the legal effect of the order of December 6, 1938, was to vacate and nullify the order of October 11, 1938. There is considerable reputable authority in support of the proposition that a former order or judgment of a court may be impliedly vacated by a subsequent order or judgment, entered during the same term, that is clearly inconsistent therewith, or that is clearly inconsistent with the continuance in force and effect of the former order or judgment.

The case of Chapman v. St. Stevens Protestant Episcopal Church, 105 Fla. 683, 136 So. 238, 138 So. 630, 139 So. 188, is strong authority for the proposition that, in spite of the fact that an order or judgment may have been rendered and the mandate sent down to the lower court during the

current term, and the usual time for rehearing having expired, or having been applied for and denied in due course, nevertheless the power of an appellate court over its orders and judgments persists to the end of the term at which such order or judgment is rendered; that during the term at which an order or judgment is rendered, the court has the jurisdiction and power, which it may exercise as the circumstances and justice of the case may require, to reconsider, revise, reform or modify its own order or judgment for the purpose of making the same accord with law and justice, and that to that end it has the power to recall its own mandate after the same has been sent down to the trial court pursuant to such former order or judgment.

I do not think there can be any doubt about the proposition that a case can be carried over from one term to the ensuing term by the pendency of a petition for rehearing which remains undisposed of. This has been the practice and holding of this Court for many years. The Avon Park case, *supra,* held that the general rule that the power of a court over its orders and judgments terminates when the term at which they were rendered expires, is modified in that State, as to cases in the circuit court, by the statute permitting the court to entertain and act upon a motion for new trial presented within the statutory period, and as to cases in the Supreme Court by its long established rule permitting the filing of petitions for rehearing within fifteen days after rendition of judgment.

In the case of State *ex rel.* Davis v. City of Avon Park, *supra,* a case of original jurisdiction, it was held that where a petition for rehearing was filed during the following term, but within the fifteen days from the date of the judgment which is allowed by the rule for the filing of such petitions, this carried the case over into the subsequent term, in spite

of the fact that the judgment to which the petition was addressed was rendered during the preceding term; and that although such petition for rehearing was subsequently denied during such following term, this Court could, during said term, vacate the order denying such petition and grant a rehearing.

The case of Foster v. Thornton, 125 Fla. 699, 170 So. 459, cannot, in my opinion, be cited as a binding precedent. That case had an unusual history in this Court, but no question of jurisdiction appears to have been raised or discussed. However, as the case has been referred to quite frequently, its unique history is of some interest here. The judgment of the trial court in that case was reversed by this Court on August 10, 1933. Petition for rehearing was filed during that term and continued over into the following term, during which the judgment of reversal was receded from and the judgment of the court below was affirmed on February 9, 1934. After the judgment of affirmance was rendered, plaintiff in error filed a petition for rehearing, which was denied on February 27, 1934. Our records show that the mandate went down on March 1, 1934. During that same term, the January term, 1934, a second or "supplemental" petition for rehearing was filed, also a motion to recall the mandate and reinstate the cause upon the docket so that the Court could consider the supplemental petition for rehearing. This motion was not disposed of during that term, but was continued over into the June term, 1934, by special order of the Court, and on June 26, 1934, this Court entered its order directing the clerk of the circuit court to return the mandate to this Court. The power of this Court to do this appears not to have been questioned or considered. A second oral argument was, during said June term, allowed and heard on July 31, 1934, and on December

6, 1934, during the same term, a *per curiam* opinion was filed announcing an equal division of the Court, and an order made reinstating the original judgment of reversal which had been rendered on August 10, 1933. See Foster v. Thornton, 113 Fla. 600, 152 So. 667; 119 Fla. 49, 150 So. 490, and 125 Fla. 699, 170 So. 459. Whether appropriate or not, the Court by its order made during the 1934 January term, although the mandate had been sent down, attempted to carry the case over into the following June term, during which term the Court, after recalling the mandate and allowing a rehearing, reinstated and adhered to its original judgment of reversal, and the Court's power to do so does not appear to have been questioned by counsel or discussed by the Court. At any rate, regardless of what had happened, the final result, and the original judgment, were the same.

In the case of State *ex rel.* Davis, Attorney General, v. City of Clearwater, 108 Fla. 635, 146 So. 836, it was held that this Court could vacate its judgment, rendered on rehearing, after the term at which it was entered had expired, where the mandate had not been transmitted to the lower court, upon the theory that jurisdiction was retained by the appellate court until the trial court had been re-invested with jurisdiction; by transmission to it of the Court's mandate; that, "there can be no vacuum in jurisdiction."

A general rule which has support in many jurisdictions is that after a mandate has issued and the term expired, an appellate court ordinarily has no power thereafter to recall its mandate and reconsider, alter or modify its decision, except for the purpose of correcting clerical errors or mere matters of form. But a number of States have held that an appellate court has power to recall its mandate and correct, change or modify its judgment during the term at

which it was rendered. See the Annotations to Chapman v. St. Stevens Protestant Episcopal Church, *supra,* in 84 A. L. R., pp. 579-601. Yet it appears that the rule in many, if not a majority, of the States is that an appellate court loses jurisdiction of a case after its mandate has been lodged in the trial court and cannot recall its mandate even during the term in which its judgment was rendered. So the holding in our Chapman case was apparently contrary to the· weight of authority in other jurisdictions. However, it has been consistently followed in this State ever since its rendition.

I have read all of the Florida cases dealing with this general subject (see cases cited in note below) and I am not convinced that this Court was without jurisdiction to enter the order of December 6, 1938, and I am therefore of the opinion that the motions attacking said order are not well founded, and should be denied.

WHITFIELD and BUFORD, J. J., concur.

---

NOTE. Most of our Florida cases which have a bearing upon the question above discussed are the following: Horn v. Gartman, 1 Fla. 197; Trustees of I. I. Fund v. Bailey, 10 Fla. 238; Forcheimer v. Tarble, 23 Fla. 99, 1 So. 695; Lovett v. State, 29 Fla. 384, 11 So. 179; Brown v. State, 29 Fla. 494, 11 So. 181; Merchants' National Bank v. Grunthal, 39 Fla. 388, 22 So. 685; Washington v. State, 92 Fla. 740, 110 So. 259; Lake v. State, 101 Fla. 646, 135 So. 123; Chapman v. St. Stephens Protestant Episcopal Church, 105 Fla. 683, 136 So. 238, 138 So. 630, 139 So. 188; 84 A. L. R. 566; note 579-601; Fla. Motor Lines v. Hill, 106 Fla. 33, 143 So. 261; State v. City of Clearwater,· 108 Fla. 635, 146 So. 836; McGregor v. Hannock, 114 Fla. 259, 154 So. 191; Hewitt v. International Shoe Co., 115 Fla. 508, 155 So. 725; Allen v. Broward County Loan & Mortgage Co., 118 Fla. 446, 159 So. 524.

PER CURIAM.—We give a chronology of the steps in the appeal leading up to the motion now under consideration, as follows:

The opinion of the Court was filed March 29, 1938, affirming the decree of the lower court; April 11, 1938, petition for a rehearing was filed; June 13th, the January term ended and on the following day the June term commenced; June 18th, petition for rehearing was denied and four days later the order denying it was vacated; October 11th, petition for rehearing was again denied, and the following day an extraordinary application for rehearing was lodged; October 13th, the mandate issued; November 25th, a petition was presented for leave to file a motion to recall the mandate and make oral argument; over objection of opposing counsel, on December 6th, an order was entered recalling the mandate and granting a rehearing on the extraordinary petition.

During the proceedings above set out, until the first day of November, 1938, the personnel of the Supreme Court was unchanged, and on that date one member, who had voted on all of the petitions for rehearing, retired from the Court and was succeeded by a new appointee. Subsequent to this substitution, the last petition for rehearing was filed and granted by a vote of three to two, the new appointee not participating. Thus, it will be seen that, the motion carried by a vote of three to two, whereas, prior to that time, petitions for rehearing had been denied twice because a majority of the Court did not concur in voting affirmatively on the applications.

After the extraordinary petition for rehearing was granted and the mandate ordered recalled, a motion was made by opposing counsel to strike from the records the last order

of December 6th because of the circumstances apparent from a study of the above history of the Court's action.

Movants challenge the authority of the Court to grant the petition on vote of three in favor of it and two against, and question the jurisdiction of the Court because the petition for rehearing continued from one term to the next was denied and the mandate issued in the latter term.

Apparently the precise matter has not been decided by this Court before.

The Court loses its jurisdiction to consider an extraordinary petition for rehearing and recall of the mandate where nothing of record appears to carry the matter over until the following term. Allen v. Brevard County Loan & Mortgage Co., 118 Fla. 446, 159 South. Rep. 524.

Failure to send the mandate down, where the case was decided "four or five days" before the expiration of the term, was held in State *ex rel*. Davis v. City of Clearwater, 108 Fla. 635, 146 South. Rep. 836, to continue the jurisdiction of the Court over the cause from one term to the next.

In State *ex rel*. Davis v. City of Avon Park, 117 Fla. 556, 151 South. Rep. 701, the Court decided that in original proceedings in quo warranto, where petition for rehearing was filed within fifteen days but after the end of the term in which the judgment was rendered, the Court could entertain the cause further, after denying a petition for rehearing in the succeeding term, and vacate the order of denial.

There is no doubt that where a petition for rehearing is filed in one term, as was done in the above case, and the term ends without the application having been adjudicated, the Court may in the new term, dispose of the matter. The question is, whether, if the ruling is adverse to the petitioner and the mandate is sent down, the Court

has the power to entertain a subsequent petition in the same cause.

We believe that having denied the petition for rehearing and the mandate having been issued to the lower court the litigation ended, and there was no justification for entertaining the matter further in the new term.

We are of the opinion, too, that the personnel of the Court having remained the same at the time both petitions for rehearing were denied, the last extraordinary petition for rehearing should not have been granted on the vote of five remaining members of the Court.

At the time of the denial of neither the first nor second application for rehearing was there impending an *immediate* change of the personnel, although the retirement of one of the members of the Court was in prospect.

In the interest of speeding the work of the Court and finally deciding the disputes of litigants, it is important that a period may be placed somewhere in the process of appeals, and we think that it should have been fixed at the point where the mandate was issued in October. Although the Court should strive to determine by a clear majority the issues presented to it, yet it is none the less important that the litigation between the immediate parties be decided as speedily as practicable, even by a divided opinion setting no precedent for the future assistance of litigants and lawyers. The instant matter has been thoroughly presented and an honest effort has been made to meet both those ends.

There seems to be no sound reason to prolong the controversy. We conclude that the motion to dismiss and set aside the last order entered in said cause on December 6, 1938, granting extraordinary petition for rehearing and recalling the mandate should be vacated and that anything

said by the Court in State *ex rel.* Davis v. City of Avon Park, *supra,* to the contrary be overruled.

It is so ordered.

TERRELL, C. J., and THOMAS and CHAPMAN, J. J., concur.

BROWN and BUFORD, J. J., dissent.

BUFORD, J. (dissenting).—There was no effective final judgment of this Court until the mandate was issued October 13, 1938. The judgment then becoming effective was under the control and jurisdiction of this Court until the end of the then current term and the Court retained the power to vacate or modify it during the remainder of the term.

When the Court is acting or sitting as a body, four or more Justices participating constitute a quorum and affirmative action by a majority of such participating quorum constitutes valid action by the Court.

BUFORD, J.—On our order filed herein on December 6th, 1938, mandate theretofore issued during the then continuing term was recalled and a rehearing granted. Reargument has been heard and additional briefs have been submitted and considered.

So much has been written in opinions heretofore filed March 28th and 29th and October 11th, 1938, that it appears no useful purpose can be served by repeating much which has already been said in the various opinions anent this cause.

The suit in the lower court was by way of bill in chancery seeking injunctive relief against the levy and assessment of taxes to pay interest and to create a fund to pay principal of bonds. The suit involves three issues of bonds issued by the Town of Belleair, Florida. The first was an issue of $300,000.00 known as Public improvement

Bonds dated July 1, 1924. The second was an issue of $119,700.00 known as Paving Improvement Bonds dated May 15, 1925. The third was an issue of $700,000.00 in several series dated August 1, 1925, and subsequent dates, respectively.

There is involved the validity of several issues of refunding bonds based on one of the above mentioned issues. Eighty thousand dollars of the $700,000.00 issue of Paving Improvement Bonds were refunded and validated by decree of the circuit court on August 17, 1927. One hundred thousand dollars of the $700,000 issue was refunded and the refund validated by the circuit court on April 20, 1928. Other bonds of that issue were refunded and validated October 4, 1929.

The validation decree as to these latter refunding bonds does not appear in the record but it is alleged that the refunding issue was made and the decree entered validating the same.

As to the $119,700 issue there is a paucity of information in the record but there is not a sufficient showing to warrant a decree holding those bonds to be invalid, especially in view of the provisions of Chapter 10338, Special Acts of 1925, which Act is:

"An Act To Make Valid Certain Municipal Improvement Bonds of the Town of Belleair Heights To Define the Authority of Said Town To Issue Certain Improvement Certificates and To Validate Certain Proceedings in Respect of the Issuance and Sale of Said Bonds.

"Whereas, the Town of Belleair Heights has a contract with C. R. Scott Company for the improvement and paving of certain streets and sidewalks in said City, and the said C. R. Scott Company has agreed to accept as part payment under the said contract Municipal Improvement Bonds of

said Town, issued under Section 1907 of the Revised General Statutes, based on certificates issued under Section 1906 of the Revised General Statutes,

"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF FLORIDA:

"Section 1. All such bonds heretofore issued or hereafter to be issued in regard to the improvements covered by the said contract are and shall be valid if based upon certificates purporting to be issued under the said Section 1906, notwithstanding any irregularity in the making of the said contract, in the issue of said certificates or in the laying of the assessments in regard to which said certificates are or may be issued; and the said Town is hereby authorized to exercise in addition to its other powers, the powers granted by the said Section 1906 and all certificates purporting to be issued under the said Section 1906 whether heretofore issued or hereafter to be issued are and shall be valid if issued pursuant to the provisions of the said Section 1906.

"Section 2. That the authorization, issuance and sale of said bonds to the said C. R. Scott Company in accordance with said contract are hereby ratified, validated and confirmed.

"Section 3. This Act shall become a law upon its passage and approval by the Governor, or upon its becoming a law without such approval.

"Approved May 13, 1925."

One of the major contentions is that this bond issue of $119,700.00 was and is void because an inspection of the record shows that it was when superimposed on the then outstanding $300,000.00 issue, sufficient to make bonds then outstanding in excess of the amount in which the municipality was at the time authorized to issue bonds. This

might present a troublesome question, had the $300,000.00 issue been a valid issue or one which could have been made valid and binding, but it will be seen that on the face of the record the $300,000.00 issue never became an enforceable or binding obligation. Certainly, one may not say the $300,000.00 bond issue was void, but that it was a binding obligation, which precluded the municipality from issuing other obligations before that one was reduced by payments or discharge, or the prohibitory statute removed by legislative Act.

The validity of the $300,000 bond issue is challenged on a ground not discussed in the first opinion herein filed March 28, 1938.

The Town of Belleair Heights was created by Chapter 9686, Special Acts of 1923. The validity of the Act is not challenged. The Act incorporating Belleair Heights became effective from and after its passage and approval by the Governor and was approved June 6, 1923.

The power and authority of the Municipality to issue and sell bonds was prescribed and limited by Section 44 of the Act which, *inter alia,* provides:

"The Town of Belleair Heights shall have the right to issue and sell bonds for municipal government improvements; Provided such issue and sale of bonds shall be ratified by a majority of the qualified electors of said Town who are taxpayers and who paid taxes on their own property in the Town of Belleair Heights assessed and levied for the calendar year prior to that in which said election is held and actually voting at an election to be held for that purpose, not to exceed the amount of 15 per cent of the assessed value of the taxable property of said town."

Section 47 of the Act provides:

"All of the property within the Town of Belleair Heights

taxable for State and county purposes shall be assessed and listed for the purpose of taxation on the town assessment roll, and railway and railroad companies, including street railway companies, shall be subject to assessment and taxation on all real estate and personal property owned by them within the limits of the corporation in the same manner and at the same ratio and valuation as other property, save and except roadbeds and rolling stock of said railroads, which shall be assessessed by the Comptroller as now provided by law, and it shall be the duty of the tax assessor of said town, between the first Monday in January and the first Monday in June each year to ascertain by diligent inquiry all taxable property, both personal and real estate, in the Town of Belleair Heights and the names of the persons owning the same, and on the first Monday in January of each year to make an assessment of all such taxable property. He shall visit and inspect all real estate, unless acquainted therewith, and the improvements thereon, and fix a valuation on the same and shall require owners of personal property to return and value the same under oath; and in case the owner of personal property neglects and fails to return the same the assessor of taxes shall assess the same, fix a valuation thereon, and any person or persons so neglecting to make return under oath shall not be permitted afterwards to reduce the valuation by such assessor on his personal property for that year; Provided that any error therein may be corrected by the board of commissioners of the Town of Belleair Heights at the time of the equalization by them of the tax assessment of said city. The assessor of taxes is hereby authorized to administer oaths to all persons returning their personal property."

There was no provision for the levy and assessment of

taxes for the year 1923. The bond election was held prior to July 1, 1924, and it, therefore, appears that at that time the Town by its charter Act was precluded from issuing bonds because under the express terms of the charter Act bonds could only be issued, "Provided such issue and sale of bonds shall be ratified by a majority of the qualified electors of said town who are tax-payers and who paid taxes on their own property in the town of Belleair Heights assessed and levied for the calendar year prior to that in which said election is held and actually voting at an election to be held for that purpose." The issuing authority being without power to issue bonds, a judicial validating decree could not confer validity. See cases hereinafter cited.

This is true because under the statute the power of the municipality to issue bonds did not accrue or exist prior to January, 1925, and by the terms of the statute the municipality was denied the power until such time as it became possible to hold an election under the terms of the statute. (See 94 U. S. 429; 74 Fed. 535.) The power to issue bonds not having been attained, the bonds were void *ab initio*. If the power to issue bonds had accrued then the question of whether or not the power had been regularly and lawfully exercised could have been presented in a validating proceeding and, therefore, a validation decree entered by a court of competent jurisdiction having jurisdiction of the parties and the subject matter under the Constitution and valid statutes would forever put at rest such issues of fact. Stated another way, it may be said, that if such an election as was required could have been held then a validating decree adjudging it to have been held would establish forever that it was held and that question of fact would be thereby concluded. See Board of Public Instruction v. State *ex rel*. Tanger Investment Co., 121 Fla. 703, 164 Sou. 697.

It so happens that the proceeds of this $300,000 issue was used for building a sea wall and making other improvements which were chiefly beneficial to a private corporation.

The Town of Belleair was created succeeding the Town of Belleair Heights by Chapter 10335, Special Acts of 1925. Sub-section (d) of Section 3 of that Act provides:

"Shall have the power within and without its territorial limits, to construct, condemn, purchase, acquire, lease or to maintain, conduct and operate within and without its corporate limits, wharves, warehouses, ship-channels, break-waters, jetties, sea walls, water-works, parks, athletic fields, golf links, drives, lighting plants, gas plants, telephone systems, power plants, transportation systems, graveyards, pest-houses, hospitals and libraries, for the use of said Town and its inhabitants, and to make a contract of whatever nature in connection therewith, and shall enforce such purchase, if necessary, by eminent domain proceedings, and shall have the right and power to issue bonds for any of the aforesaid purposes and for refunding any indebtedness, upon the majority vote of all electors actually voting at any bond election, provided that no bond election shall be required for the purposes set forth in Section 24 of this Act, and provided further that no bond election shall be required for the purposes set forth in Section 24 of this Act, and provided further that no elector shall participate in any bond election who is not a freeholder in said Town, and who is not otherwise qualified as a voter therein. Provided also that the maximum amount to which said Town of Belleair may bond shall not exceed twenty-five per cent (25%) of its assessed valuation."

Section 24 of Chapter 10336, Special Acts of 1925, provides:

"The term 'local improvements' as referred to in Section

1 of this Act, shall be construed to mean the following improvements, namely:

"(a)   Streets, highways, boulevards, avenues, squares, lanes, alleys and parks, or any part thereof, may be opened, reopened, widened, graded, regraded, paved, repaved, surfaced or resurfaced, and curbs and gutters may be constructed or reconstructed therein, together with the necessary storm sewers, drains and catch basins, necessary to and incident in paving of such highways, boulevards, avenues, squares, lanes, alleys and parks.

"(b)   Sanitary sewers, storm sewers and other drains or sewers may be laid or relaid, and constructed or reconstructed in any streets, highway, boulevard, avenue, square, lane, alley or park.

"(c)   Side-walks and white-ways may be constructed, reconstructed, widened, altered or changed along any highway, boulevard, avenue, squares, lanes, alleys and park thereof.

"(d)   Trees and shrubbery may be purchased and planted in parkways between property lines and curb."

The $700,000 bond issue appears to have been promulgated under the provisions of Chapter 10337, Special Acts of 1925, the title of which is:

"An Act Providing a Supplemental, Additional and Alternative Method of Making Local Improvements for the Town of Belleair, a Municipal Corporation, Authorizing and Providing for Special Assessments for the Cost Thereof, and Authorizing the Issuance and Sale of Bonds for Such Municipality."

And Sections 1 to 8, inclusive, which are as follows:

"Section 1.   Whenever the Town of Belleair, a municipal corporation existing under the laws of this State hereinafter referred to as the 'Municipality' shall have (either

heretofore or hereafter), by its board of commissioners or other governing authority, hereinafter referred to as the 'Governing Authority,' awarded contracts for local improvements, as specifically provided in Section 24 of this Act, and to be made wholly or in part at the cost of the property· owners benefited thereby and the payment for which improvements it proposes to provide by levying and assessing and collecting special assessments for any and all of the improvements authorized under Section 24 of this Act, the Town of Belleair is hereby authorized to estimate and determine the cost of the improvements to be raised by special assessments against the property benefited, and may by resolution issue improvement bonds pledging the full faith and credit of the municipality to an amount not exceeding 90 per cent of such estimate. Said bonds may be sold but shall not be delivered except as the work progresses. Said bonds may be issued in series or installments from time to time as the governing authority may determine. Such bonds shall be general obligations of the municipality and if special assessments be not imposed and collected in respect of the improvement in season to pay the principal and interest, the municipality by its governing authority and other officers shall levy and collect on all taxable property in the municipality a tax sufficient to pay such principal and interest as the same respectively become due and payable.

"Sec. 2. Upon the final completion of any contract for a public improvement, and after an assessment of benefits has been confirmed by the governing authority, as hereinafter provided, the governing authority of the municipality may by resolution issue Improvement Bonds pledging the full faith and credit of the Municipality to an amount not exceeding the unpaid assessments, as so confirmed; provided,

however, that if any bonds have been issued under the preceding section upon an estimate of the cost of the improvement, the bonds issued under this section shall not in the aggregate exceed the amount of the unpaid assessments, as so confirmed. All special assessments levied and imposed in respect of the improvements shall constitute a fund for the payment of the bonds authorized, by this and the preceding section, and in the event that there be any failure to collect and receive the said special assessments in season to pay the principal and interest of the said bonds, the municipality by its governing authority and other officers shall levy and collect on all of its taxable property in the municipality a tax sufficient to pay such principal and interest as the same respectively become due and payable. All bonds issued under this title and the preceding section shall be excluded from any limitation of indebtedness prescribed by the Charter of the municipality, by Special Act or by the General Laws.

"Sec. 3. All bonds issued under the two sections immediately preceding shall mature and become payable in not more than ten annual installments, which shall be substantially equal in amount and the last of which shall be payable in not more than ten and one-half years from the date.

"Sec. 4. All bonds issued under this Act shall be in the denomination of One Hundred Dollars or some multiple thereof, and shall bear interest not exceeding six per centum per annum, payable annually, or semi-annually, and both principal and interest shall be payable at such place or places as the governing authority may determine. The form of such bonds shall be fixed by resolution of the governing authority of the municipality, and the said bonds shall be signed by the mayor or chief executive officer of the

municipality and the town clerk thereof, under the seal of the municipality. The coupons shall be executed by ·the fac-simile signature of the Town Clerk. The delivery of any bond and coupon so executed at any time thereafter shall be valid, although before the date of delivery the person signing such bonds or coupons shall cease to hold office.

"Sec. 5. Bonds issued hereunder shall have all the qualities of negotiable paper under the law merchant, and shall not be invalid for any irregularity or defect in the proceedings for the issue and sale thereof, and shall be incontestable in the hands of bona fide purchasers or holders thereof for value.

"Sec. 6. Before any bonds of any municipality are issued hereunder, the governing authority shall investigate and determine the legality of the proceedings. The resolution authorizing the bonds may direct that they shall contain the following recital:

" 'It is certified that this bond is authorized by and is issued in conformity with the requirement of the Constitution and statutes of this State.' Such recital shall be an authorized declaration by the governing authority of the municipality and shall import that there is constitutional and statutory authority for incurring the debts and issuing the bonds; that all the proceedings thereof are regular; that all acts, conditions and things required to exist, happen and be performed precedent to and in the issuance of the bond have existed, happened and been performed in due time, form and manner as required by law; that the amount of the bond, together with all other indebtedness, does not exceed any limit or limits prescribed by the Constitution and Statutes of this State. If any bond be issued containing such recital, it shall be conclusively presumed that said recital construed according to the import hereby declared is

true, and neither the municipality nor any taxpayer thereof shall be permitted to question the validity or legality of the obligation in any court, in any action or proceeding.

"Sec. 7. All bonds issued hereunder shall be sold for not less than ninety-five cents and accrued interest to date of delivery and in such a manner as the governing authority shall determine, or as may be provided in any section of the town charter relative to the sale of bonds; provided, however, that nothing contained herein, or any section of the town charter, or any other act, shall be construed to mean that any bonds herein provided for must be ratified or submitted to the vote of the electors of the said town provided, further, that all contracts heretofore made and entered into for the sale of bonds based on special assessments are hereby validated and confirmed and the municipality is hereby authorized to proceed in the carrying out of said contracts and said bonds may be issued under the provisions of this Act without respect to the provisions of any other Act or law or section of the town charter relative to the manner of sale and issuance of bonds of said municipality.

"Sec. 8. This Act shall, without reference to any other Act of the Legislature of Florida, be full authority for the issuance and sale of the bonds in this Act authorized, and shall be construed as an additional and alternative method for financing of the improvements herein referred to. No ordinance, resolution or proceeding in respect of the issuance of said bonds hereunder shall be necessary, except such as is required by this Act. No publication of any resolution, ordinance or proceeding relating to the issuance of the said bonds shall be required, except such as is required by this Act."

And Section 24 is:

"The term 'local improvements' as referred to in Section

1 of this Act, shall be construed to mean the following improvement, namely:

"(a) Streets, highways, boulevards, avenues, squares, lanes, alleys and parks or any part thereof, may be opened, re-opened, widened, graded, re-graded, paved, re-paved, surfaced or re-surfaced, and curbs and gutters may be constructed or reconstructed therein, together with the necessary storm sewers, drains and catch basins necessary to and incident in paving of such highways, boulevards, avenues, squares, lanes, alleys and parks.

"(b) Sanitary sewers, storm sewers and other drains or sewers may be laid or re-laid and constructed or reconstructed in any streets, highways, boulevard, avenue, square, lane, alley or park.

"(c) Sidewalks and white-ways may be constructed, reconstructed, widened, altered or changed along any highway, boulevard, avenue, squares, lanes, alleys and park thereof, and the planting of trees and other ornamental shrubbery in parkways, between lot line and street curbs."

This Act is the most important legislation involved in this latter bond issue and yet we fail to find it given any prominence in any brief filed here, or in oral argument.

The resolution by the city commission contemplating and authorizing the issuance of the $700,000 bond issue was sufficient to show compliance with the provisions of the Act last quoted and the charter provision, *supra.*

The bonds of that issue recited:

"KNOW ALL MEN BY THESE PRESENTS: That the Town of Belleair, a municipal corporation in the County of Pinellas, State of Florida, for value received, acknowledges itself indebted and promises to pay to bearer, on the 1st day of August, A. D. 1931, ONE THOUSAND DOLLARS, with interest thereon from date hereof until paid, at the rate of

six (6) per cent per annum, payable semi-annually, on the 1st day of February and the 1st day of August each year, on presentation and surrender of the annexed coupons hereto attached as they severally become due. Both principal and interest payable in gold coin of the United States of America of current weight and fineness, at the Banking House of Harriman National Bank, of the City of New York, and the said Town of Belleair is hereby held and firmly bound and its full faith, credit and resources are hereby irrevocably pledged for the payment of the principal and interest hereof at maturity.

"This bond is one of a series of six (6) series of bonds aggregating $700,000.00 issued by the Town of Belleair for the purpose of securing funds with which to pay contracts for street and sidewalk paving and street improvements and is issued in conformity with and under the provisions of Senate Bill No. 655, Laws of Florida 1925, and pursuant to resolutions of said Town duly passed, approved and adopted as required by law, and it is certified that this bond is authorized by and issued in conformity with the requirements of the Constitution and statutes of this State.

"It Is Hereby Certified and Recited that all acts, conditions and things required by the Constitution and laws of the State of Florida and by the Charter of said Town to exist, happen and be performed precedent to and in the issuance of this bond, do exist, have happened and been performed in regular and due form, time and manner as required by law, and that the amount of this bond, together with all other indebtedness of said Town, does not exceed any limitation imposed by either the Constitution or statutes of Florida, or by the Charter of said Town."

The decree of validation, *inter alia,* held and decreed:

"This cause coming on to be heard on the 11th day of

July, A. D. 1925, before the court in the City of Clearwater, Florida, pursuant to a prior order of this court made herein upon the 19th day of June, A. D. 1925, and upon the filing of the petition of the Town of Belleair, which petition was duly sworn to by Ed A. Haley, Acting Mayor of Belleair, and the answer of the State of Florida through E. P. Wilson, State Attorney for the Sixth Judicial Circuit of the State of Florida, and there being no person appearing pursuant to the notice published by the clerk of this court;

"And it appearing to the court and the court so finds that the clerk of this court did publish in the Clearwater Evening Sun, a newspaper published in the County of Pinellas, a notice addressed to the citizens and taxpayers of the said Town of Belleair, as required by law, which said notice was published once a week for three consecutive weeks, the first of said publications being on the 19th day of June A. D. 1925, and which said notice was in proper form and fully complied with the requirements of law;

"And it further appearing to the court and the court so finding that all things, conditions and requirements necessary and requisite to the issuance of said bonds have been, have happened and been performed as set forth in said petition, and that all the requirements of law in every respect have been fully met, fulfilled and complied with by the officers charged by law with the duties and requirements incident to the issuance of said bonds;

"And it further appearing to the court that the purpose for which said bonds were issued, to-wit: for providing funds with which to pay contracts for street and sidewalk paving and street improvements to the amount of $700,-000.00 is a purpose authorized by law for the issuance of said bonds and that said bonds should be validated and confirmed:

"It Is, Therefore, Ordered, Adjudged and Decreed by the court that the issue of bonds to the amount of $700,000 for providing funds for the payment of contracts for street and sidewalk paving and street improvement in the Town of Belleair, to be issued in six series and to be dated and to mature as follows, to-wit:

"Series A for $100,000.00, to be dated August 1, 1925, and $10,000 of said bonds to mature on the first day of August in each of the years 1926 to 1935, inclusive.

"Series B for $100,000.00 to be dated September 1, 1925, and $10,000 of said bonds to mature on the 1st day of September in each of the years 1926 to 1935, inclusive.

"Series C for $100,000 00 to be dated October 1, 1925, and $10,000 of said bonds to mature on the first day of October in each of the years 1926 to 1935, inclusive.

"Series D for $100,000.00 to be dated November 1, 1925, and $10,000 of said bonds to mature on the 1st day of November in each of the years 1926 to 1935, inclusive.

"Series E for $100,000.00 to be dated December 1, 1925, and $10,000 of said bonds to mature on the 1st day of December in each of the years 1926 to 1935, inclusive.

"Series F for $200,000.00 to be dated January 1, 1926, and $20,000.00 of said bonds to mature on the 1st day of January in each year of the years 1927 to 1936, inclusive.

"To draw interest at the rate of six percent (6%) per annum, payable semi-annually, to be in denominations of One Thousand Dollars ($1,000.00) each, both principal and interest payable in the City and State of New York and as otherwise set out in said petition and as authorized by a resolution of the Town Commissioners of the Town of Belleair, on the 18th day of June, A. D. 1925, be and they are hereby validated and confirmed and that henceforth said bonds shall never be questioned in any Court in this State,

and that upon the issuance of said bonds there shall be stamped or printed on each of said bonds the following endorsement:

"'Validated and confirmed by decree of the Circuit Court of the Sixth Judicial Circuit of the State of Florida in and for Pinellas County; dated the 11th day of July, A. D. 1925,

" '..................................................
" 'Clerk of the Circuit Court of the Sixth Judicial Circuit of the State of Florida, in and for Pinellas County.'

"And which said endorsement shall be signed by the Clerk of said court, and the official seal of said Clerk thereunto attached.

"DONE AND ORDERED in the City of Clearwater, Florida, this 11th day of July, A. D. 1925.

"M. A. McMullen, Judge."

There was no appeal from this decree and it became a final adjudication of the validity of the bonds involved.

The conclusions which we have herein stated are in line with those stated, and are amply supported by the authorities cited by Mr. Justice WHITFIELD, in the opinion prepared by him and filed in this cause on March 28, 1938, wherein he stated:

"The Constitution of Florida contains the following: 'No tax shall be levied for the benefit of any chartered company of the State, nor for paying interest on any bonds issued by such chartered companies, or by counties or by corporations, for the above mentioned purposes.' Sec. 7, Art. IX, Florida Constitution.

"The organic section forbids taxation *for the benefit of any chartered company* of the State or *for paying interest*

on any bonds *issued* by any chartered company of the State or by counties or by corporations *for the benefit of any chartered company of this State.*

"The evil sought to be avoided by the organic section is taxation for the benefit of any chartered company of this State as is illustrated in the issue of bonds by counties and cities to aid in the construction of railroads. See Columbia County v. King, 13 Fla. 451; Canover v. Baker County, 18 Fla. 512; County of Jefferson v. Lewis, 20 Fla. 980; Jefferson County v. Hawkins, 23 Fla. 223, 2 So. 362; Sec. 22, Chap. 610, Internal Improvement Fund Act of 1855, approved Jan. 6, 1855; Hawkins v. Mitchell, 34 Fla. 405, 16 So. 311; Wilson v. Mitchell, 43 Fla. 107, 30 So. 703; Trustees Internal Improvement Fund v. Bailey, 10 Fla. 112.

"Where county or municipal or district bonds are legally issued for public improvements of public facilities, the mere fact that corporations or individuals are benefited by such public improvements or facilities along with or in common with the public generally, does not violate Section 7 of Article IX of the Constitution. Hunter v. Owens, 80 Fla. 812, 86 So. 839; West v. Town of Lake Placid, 97 Fla. 127, 120 So. 361; Whitney v. Hillsborough County, 99 Fla. 628, 127 So. 486.

"Decrees validating municipal bonds duly rendered under the statute are conclusive of the validity of the bonds validated unless there was no legal authority to issue the bonds, or unless the statute or the bonds or the record of the proceedings under which the bonds were issued, show that the bonds violate some command or prohibition of the Constitution relating to the bonds. Commands and prohibitions of the Constitution control over legislative or judicial validations of bonds. Validations cannot supply an entire absence of authority to issue municipal bonds, or cure a

patent violation of a command or prohibition of the Constitution. Weinberger v. Bd. Pub. Inst., 93 Fla. 470, text page 492, 112 So. 253. * * *"

At least the greatest part of the bonds have been validated by judicial decrees under the jurisdiction conferred by the statute, all of 'the taxpayers and citizens of the * * * municipality' being, by notice published under this statute, made parties defendant to the validating proceedings. No taxpayer asserted the invalidity of the bonds in the validation suits, and the decrees of validation are conclusive against the 'municipality * * * and against all taxpayers and citizens thereof.' Sec. 5109 (3299) C. G. L. *No violation of a command or prohibition of the Constitution* in issuing the bonds is shown by the statute or by the bonds or by the record for issuing the bonds. Such a violation of organic law, if so shown, would be binding notice to purchasers of the bonds. See 44 C. J. 1243. The bonds state the statutory authority under which they were issued and recite a compliance therewith, together with a pledge of full faith and credit of the town for the payment of the bonds. Recitals and covenants contained in the bonds are binding on the taxpayers, and no violation of the Constitution in issuing the bonds appears by the bonds or by the issuing or validating proceedings. Sparks v. Ewing, 120 Fla. 520, 163 So. 112; City of Hialeah v. United States, 87 Fed. (2d) 953; State *ex rel.* Conn v. Henderson, 130 Fla. 288, 177 So. 539; Hillsborough County v. Keefe, 82 Fed. (2d) 127; State *ex rel.* Rogers v. Walthal, *et al.,* 125 Fla. 423, 170 So. 115. See also Validating Act, Chapter 10338, Acts of 1925; 44 C. J. 1254; 104 Fed. 473, 486; 17 Fla. 174; 125 Fla. 423, 170 So. 115, 123 Fed. 1.

"If the bonds or the *proceeds of bond sales were benig illegally used* 'for the benefit of any chartered company' by

making improvements primarily for the benefit of property owned by chartered companies in building sea-walls and other improvements in front of or on such private property, as is in effect alleged, such illegal action must have been obvious to citizens and tax-payers of the town and any tax-payer could have invoked judicial decrees enjoining such asserted illegal use of the bonds or the funds; and not having done so, all have thereby waived their rights to challenge the validity of a tax to pay the bonds upon the stated grounds resting *in pais,* when, as here, no illegal use of the bonds or their proceeds for the benefit of any chartered company, as asserted, appears by the bonds or by the record of the proceedings for their issue, or by the law under which the bonds were issued. See Abell v. Town of Boynton, 95 Fla. 984, 117 So. 507; State, *ex rel.* v. Broward County Port Authority, 118 Fla. 42, 151 So. 416, 718; 158 So. 62. See Perry v. Town of Panama City, 67 Fla. 285, 65 So. 6; State *ex rel.* v. Brandon, 92 Fla. 793, 110 So. 127; 44 C. J. 1253.

"In Thompson v. Town of Frostproof, 89 Fla. 92, 103 So. 118, the bonds *had not been issued,* and it was held that no 'bonds can legally be issued to improve streets where no streets in law exist.' See City of Fort Myers v. State, 95 Fla. 704, 117 So. 97.

"In the Weinberger case, 93 Fla. 470, 112 So. 253, *the issue of bonds* by a special tax school district *was enjoined* because the bonds showed on their face that an express command of the Constitution *as to the terms of the bonds* would be disregarded and violated if the bonds were issued. The record proceedings for issuing the bonds and the terms of the bonds were in conflict with the express commands of Section 17, Article XII of the Constitution then in force. See Leonard v. Franklin, 84 Fla. 402, 93 So. 688; Barrow

v. Moffett, 95 Fla. 111, 116 So. 71; State v. Bd. Publ. Inst. Indian River County, 98 Fla. 1152, 125 So. 357; Bd. Pub. Inst. v. Union School Furniture Co., 100 Fla. 326, 129 So. 824. In State *ex rel.* Bours v. L'Engle, 40 Fla. 392, 24 So. 539, a statute authorizing general county bonds to be issued for public free school purposes in the county was adjudged to be in violation of the limitations contained in Article XII of the Constitution and, therefore, void. No bonds were issued.

"In the Nuveen case, Article XII of the Constitution impliedly forbade the issue of *Municipal* bonds for the support and maintenance of public free schools, which rendered the *bonds* ineffectual, even in the hands of purchasers for full value, because they were issued by the municipality for public free school purposes in violation of the Constitution as *shown by the record and by the bonds,* and not by matters *de hors* the record arising after the bonds were issued and sold. The statute attempting to authorize the municipality to issue bonds for public free school purposes, on its face, violated Article XII of the Constitution. Munroe v. Reeves, 71 Fla. 612, 71 So. 922; State *ex rel.* Nuveen v. Greer, 88 Fla. 249, 102 So. 739, 37 A. L. R. 1298; Nuveen v. City of Quincy, 115 Fla. 510, 156 So. 153. See also Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716. See Parkersburg v. Brown, 106 U. S. 487; Johnson v. Bd. Pub. Inst., 81 Fla. 503, 88 So. 308; Bd. Pub. Inst. v. Union School Furn. Co., 100 Fla. 326, 129 So. 824.

" 'Municipal bonds issued without competent legal authority or for a purpose that is forbidden by controlling law are invalid even in the hands of *bona fide* holders for value. And recitals of compliance with law contained in municipal bonds cannot confer authority not legally given to issue the bonds. 44 C. J. 1248; State *ex rel.* Nuveen v. Greer, 88 Fla.

249, 102 So. 739; 37 A. L. R. 1298; Holland v. State, 15 Fla. 455; State *ex rel.* Bours v. L'Engle, 40 Fla. 392, 24 So. 539; Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716; Munroe v. Reeves, 71 Fla. 612, 71 So. 922; Weinberger v. Board of Public Instruction, 93 Fla. 470, 112 So. 253; State v. Hillsborough County, 113 Fla. 345, 151 So. 712; First Natl. Bank of Key West v. Board of Public Instruction, 107 Fla. 525, 145 So. 203; O'Brien v. Wheelock, 184 U. S. 450, 22 S. Ct. 345, 46 L. Ed. 636; Sutliff v. Lake County Comm'rs., 147 U. S. 230, 13 S. Ct. 318, 37 L. Ed. 145.' See Barnett v. Bennison, 145 U. S. 135, 12 S. Ct. 819.

" 'Where there is adequate legal authority for the issue and sale of municipal bonds, and the bonds are issued for an authorized municipal purpose, mere administrative or ministerial irregularities in issuing the bonds may not render the bonds invalid in the hands of a *bona fide* holder, particularly when the bonds contain a statement that the laws have been fully complied with in issuing the bonds. See Crawford v. State *ex rel.,* 110 Fla. 301, 149 So. 340; State v. Rodes (Fla.), 151 So. 298; Jefferson County v. B. C. Lewis & Sons, 20 Fla. 980; Town of Aurora v. Gates, 125 C. C. A. 329, 208 F. 101, L. R. A. 1915A, 910, and notes. An illegal use of the proceeds of bonds legally issued and sold to *bona fide* holders for value may not affect the validity of the bonds. 44 C. J. 1247.' See also West Plains Tp. v. Sage, 69 Fed. 943; State *ex rel.* v. Broward County Port Authority, 118 Fla. 42, text page 670, 151 So. 416, 718; 158 So. 62; 104 Fed. 473, text 486.

" 'While the proceeds of bonds sold by the municipality must be applied to the purposes for which the bonds were issued and sold, the purchaser of such bonds is not required to look to the application of the proceeds, and hence it is no defense that the proceeds of the bonds were improperly

applied or used for an unauthorized purpose.' McQuillin:
Municipal Corporations (2d Ed.), Vol. 6, Sec. 2516. See
Hightower v. Raleigh, 105 N. C. 569, 65 S. E. 279; Jones
v. Camden, 44 S. C. 319, 23 S. E. 141, 51 Am. St. Rep. 819;
Clifton Forge v. Allegheny Bank, 92 Va. 283, 23 S. E. 284.

"This suit is to enjoin taxation to pay municipal bonds,
based upon matters not of record when the bonds were is-
sued: i. e., the use of the bonds or the bond *proceeds* in
violation of Sec. 7, Article IX of the Constitution. The
bonds *were issued and sold* years ago upon a record of
proceedings showing the bonds were to be issued for
*authorized municipal purposes,* and at least a large part of
the bonds were validated by decree of the circuit court under
the jurisdiction conferred by statute; and nothing in the
record of the proceedings or in the bonds indicated that
the bonds were to be used in violation of Section 7, Article
IX of the Constitution, which organic section does not re-
quire bona fide purchasers of municipal bonds to see to the
proper application of the bond proceeds. See Hightower v.
Raleigh, 150 N. C. 569, 85 S. E. 279.

"The statute under which the decrees were rendered vali-
dating the bonds, provides by published notice for appro-
priate parties, including the taxpayers and citizens of the
municipality, with adequate notice of hearing; and the
statute also provides that 'the decree of the circuit court
validating and confirming the issuance of the bonds (if not
reversed on appeal) * * * shall be forever conclusive as to
the validity of said bonds * * * against the * * * munici-
pality * * * and against all taxpayers and citizens thereof;
and the validity of said bonds * * * shall never be called
in question in any court in this State.' Sec. 5109 (3299)
C. G. L. See Little River Bk. & Tr. Co. v. Johnson, 105
Fla. 212, 141 Sou. 141; Abell v. Town of Boynton, 95 Fla.

984, 117 So. 507; Steen v. Bd. of Pub. Inst., 80 Fla. 146, 85 So. 684; Bd. Pub. Inst. v. State *ex rel.* Tanger Investment Co., 121 Fla. 703, 164 So. 697. See notes 37 A. L. R. 1310; 86 A. L. R. 1057.

"In City of Bradenton v. State, 88 Fla. 381, 102 So. 556, 36 A. L. R. 1297, the circuit court *denied a validating decree* upon averments in the answer by a taxpayer tending to show that the proposed municipal bonds if issued would violate Section 7 of Article IX of the Constitution; and such decree denying validation was affirmed by this Court.

"Any taxpayer could have contested the validating proceedings covering bonds referred to in this case, if the bonds were to be used in violation of Section 7, Article IX, Constitution. See Juvenal v. Dixon, 99 Fla. 936, 128 So. 27. Or illegal use of the bond proceeds could have been enjoined. See City of Tampa v. Salomonson, 35 Fla. 446, 17 So. 581; Suburban Inv. Co. v. Hyde, 61 Fla. 809, 55 So. 76; Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716.

"Section 7, Article IX of the Constitution of Florida does not forbid the issue or the payment of bonds of a municipality for authorized municipal purposes, or require bona fide purchasers of such bonds to see to the proper application of the bond proceeds; and when the taxpayers of the municipality acquiesce in the validation of such bonds and in the use of the bond proceeds, taxation to pay the bonds held bona fide should not be enjoined on the ground that the bond proceeds were used for the benefit of chartered companies or individuals, unless it appears by the statute authorizing the bonds, or by the bonds, or by the record proceedings for issuing or validating the bonds, that the bonds or the proceeds thereof were to be used for the benefit of chartered companies or otherwise in violation of such section 7, Article IX.

"No taxpayer resisted, as authorized by the statute, the validation of the bonds on the ground that Section 7, Article IX, would be violated by the issue of the bonds as was done in City of Bradenton v. State, 88 Fla. 381, 102 So. 556, 36 A. L. R. 1297; the issue of the bonds was not enjoined as in Weinberger v. Board of Public Instruction, 93 Fla. 470, 112 So. 253, and in Brown v. City of Lakeland, 61 Fla. 508, 54 So. 716; the bonds were validated under the statute and on their face showed they were issued in compliance with law, and they do not show that they were issued in violation of the Constitution as did the bonds held invalid in the Nuveen and Weinberger cases. Illegal use of the bond proceeds could have been enjoined."

From the conclusions reached, it follows that insofar as the decree appealed from affects the proposed tax to be levied and assessed to produce funds with which to pay the principal and interest on the $300,000.00 bond issue, *supra*, it is affirmed; but, in all other respects, it is reversed and the cause is remanded with directions that a decree be forthwith entered not inconsistent with the views herein expressed.

So ordered.

WHITFIELD and BROWN, J. J., concur.

THOMAS, J., concurs specially.

TERRELL, C. J., and CHAPMAN, J., dissent.

THOMAS, J. (concurring specially).—I took no part in the consideration of this case until the matter was presented on motion to vacate the order granting a rehearing.

My view was that the court had lost jurisdiction of the cause and that the motion to vacate was well founded. That motion lost by a divided opinion of the Court. Thus, it was necessary to study the merits of the cause. From knowledge

gained by my examination and from the argument last presented, I concur in the opinion by Mr. Justice BUFORD.

WHITFIELD, J.—The order granting a rehearing is procedural only. It *merely permits a re-argument of the cause and does not change or affect the judgment* of this Court affirming the decree appealed from. The judgment of affirmance stands as the judgment of this Court unless it is changed by a majority of the Justices of the Court sitting as a body in the cause.

I am willing to let the cause be re-argued as other causes have been. The judgment of affirmance will of course remain the judgment of this Court unless it is changed in the manner required by the Constitution.

This Court sitting as a body with five of the six Justices participating, has jurisdiction by a majority vote to grant a petition for a rehearing and to recall the mandate in a cause in which a decree of the circuit court has been affirmed by an evenly divided Court, where the petition for rehearing is *presented and granted during the term in which the mandate is issued and transmitted to the trial court.* But a petition for rehearing granted does not in any way affect the judgment of the Supreme Court rendered in the cause. Such judgment cannot be changed in its legal effect except by a direct vote of the Justices as is expressly provided by the Constitution. See Comer Bridge & Foundation Co. v. Sheeran, 119 Fla. 543, 161 So. 60; City of Marianna v. Davis, 124 Fla. 145, 169 So. 50.

The Constitution as amended in 1902 does not provide for a decision in any cause in the Supreme Court to be rendered by an even division of the six Justices of the Court; but it does expressly provide that, "The majority of the Justices of the Supreme Court shall constitute a quorum for the transaction of all business," and that, "The

concurrence of a majority of the members of the Court sitting in any cause wherein the Court shall sit as one body, shall be necessary to a decision; and when any member of a division of the Court shall dissent from the majority of such division of any question, such question shall be submitted to the Court sitting in a body." Sec. 4, Art. V.

The word "sitting" of course means participating in a decision in a cause.

Under the latter organic provision quoted above, this Court has decided numerous cases, some of which involved questions of constitutional law, on a vote of three to two when there were six Justices. See for examples, *Ex parte* Cox, 44 Fla. 537, 33 So. 509; Taylor v. State, 49 Fla. 69, 38 So. 380; State v. Town of Belleair, 125 Fla. 669, 170 So. 434. In Taylor v. Finlayson, 128 Fla. 444, 176 So. 44, long contested in this Court, the first decision was on September 3, 1935, reversing the decree; the decree was later affirmed by an evenly divided Court; the last decision, on the fourth petition for rehearing, was rendered June 28, 1937, three Justices voting to affirm the decree, one Justice dissenting, one Justice absent on account of illness; one Justice having died June 20, 1937, and his successor, appointed June 23, 1937, not participating in the decision. The decree was affirmed on a three-to-one division of the participating Justices. See also 146 So. 551.

In Carver v. State, a murder case, 101 Fla. 142, 134 So. 62, 136 So. 605, the judgment of conviction was affirmed by a four-to-two division of the Court of six Justices. A rehearing was granted and the judgment was reversed by a three-to-two vote of the Justices, one Justice not participating.

So under the Constitution when there are six members of the Court and five are participating, a decision may be made

three to two; or when four participate, a decision may be made by a vote of three to one of the Justices sitting as a body in the cause.

In State *ex rel.* v. McClung, 47 Fla. 224, 37 So. 51, it is stated that: "Under our constitutional provision an equal division of opinion can not have the effect, *ipso facto,* of an affirmance, for the Constitution makes the concurrence of a majority necessary to a decision, but where the division is permanent and there is no probability of an immediate change in the *personnel* of the Court, it becomes the duty of those in favor of reversal to unite with their associates in affirming the judgment, otherwise the case might be continued indefinitely, and the delay amount to a denial of justice. In such a case the rule with respect to the force and effect of the judgment of affirmance is the same as that which prevailed at common law where the judgment was affirmed because of an equal division of opinion. Thus it does not import a division as to the nature of the judgment, but as to the question of law and fact involved in it. While the judgment is a bar to any subsequent action for the same cause, * * * yet, as no matters of law are decided so far as the question upon which the Court is equally divided is concerned, the judgment possesses no dignity as a judicial precedent. It carried upon its face a badge which precludes any application of it in future under the doctrine of *stare decicis.* 'The judges simply agree that it is expedient to finish the litigation. It is a public expediency, and is often expedient also with respect to the interests of the parties. Supported by these considerations and the presumption of correctness which always attaches to the judgment of the court below, it is proper and right that the Judges who were in favor of a reversal should waive any insistence of opinion and unite with their associates in an

affirmance of the judgment. This they do without in any way relinquishing their convictions upon the questions of law or fact involved in the case.' Luco v. DeToro, 88 Cal. 26, 25 Pac. Rep. 983; Frankel v. Deidesheimer, 93 Cal. 73, 28 Pac. Rep. 794; Santa Rosa City R. R. v. Central St. Ry. Co., 112 Cal. 436, 44 Pac. Rep. 733."

Three to three affirmances under the procedure adopted in the McClung case, cited above, do not affect the exercise of jurisdiction as required by Section 4, Article V, of the Constitution when a justiciable matter is presented to the Court by petition or otherwise.

In Helton v. State, 93 Fla. 232, 111 So. 635, the judgment was affirmed three to three and the mandate was sent down. A rehearing was granted on which the mandate was recalled during the last term of this Court. The rehearing was granted on the ground that there had been a change in the personnel of the Court. The cause was carried over to this term *on the petition for rehearing* granted and without an order vacating the final judgment. At this term the judgment was reversed.

In Chapman v. St. Stephens P. E. Church, 105 Fla. 683, text page 717, 136 So. 238, 138 So. 630, 139 So. 188, the judgment was reversed July 21, 1931. The mandate was issued September 1, 1931, and recalled January 6, 1932. The last judgment was rendered January 9, 1933, the cause having been carried over to the succeeding terms *upon petition for rehearing* and without an order vacating the final judgment.

In Foster v. Thornton, 113 Fla. 600, 152 So. 667, "The judgment was on writ of error reversed by this Court August 10, 1935. On petition for rehearing the judgment of reversal was receded from and by opinion filed February 9, 1934, the judgment of the court below was affirmed.

Foster v. Thornton, 113 Fla. 600, 152 So. 667. Plaintiff in error then filed petition for rehearing which was denied February 27, 1934. On June 26 following this Court on motion of plaintiff in error entered its order directing the clerk of the circuit court to return the mandate to this Court. A second oral agreement was heard July 31, 1934, and on December 6, following, a *per curiam* opinion was filed which, among other things, announced an equal division of the Court and reinstated the judgment of reversal, dated August 10, 1934. Foster v. Thornton, 119 Fla. 49, 150 So. 490."

The above quotation is from the opinion in Foster v. Thornton, 125 Fla. 699, text 701, 170 So. 459.

So in the Foster v. Thornton case the judgment was reversed August 10, 1933, in the June term, 1933. On February 9, 1934, in the January term, 1934, the judgment was affirmed on petition for rehearing. The mandate was issued and transmitted to the trial court March 1, 1934, in the January term, 1934, and was recalled June 26, 1934, in the June Term, 1934. On December 6, 1934, in the June term, 1934, the judgment was again reversed.

There are at least two other cases now before the Court in which judgments were rendered and rehearings denied, and on second petitions for rehearings, the causes were carried over to this term on the petitions for rehearing which are now under consideration, no order vacating the final judgment having been made. The ground for granting the rehearings was a change in the personnel of this Court.

As the Court had jurisdiction in this term to reverse the judgment in Helton v. State, above cited, *on a petition for rehearing granted* and mandate recalled during the last term on the ground that there had been a change in the personnel of the Court, it must be that the Court has the

same jurisdiction at this term that it had at the last term. When a cause is carried over to another succeeding term or terms as in Foster v. Thornton and Taylor v. Finlayson, above cited, the Court has the same jurisdiction in each term that it had in the first term to make any order until the cause is finally disposed of in due course, and the term in which it is finally disposed of has expired. A mandate may be recalled during the term in which it is issued. And the mandate was recalled the term after it was issued in Foster v. Thornton, *supra*, 125 Fla., text page 701. This Court may grant or deny the recall of a mandate upon a proper and sufficient showing to warrant the order made.

In this case the decree was affirmed March 29, 1938, in the January term, 1938, on a three-to-three division of the six Justices. A petition for rehearing filed April 14, 1938, was carried over into the next term and denied June 18, 1938. The last order was vacated June 22, 1938. The petition for rehearing was denied by a three-to-three division of the Court October 11, 1938. Another petition for rehearing was filed October 12, 1938. The mandate was issued October 13, 1938. On November 25, 1938, during the same term in which the mandate was issued, petitions for rehearing and a recall of the mandate were filed. Objections were filed December 6, 1938. On December 6, 1938, an order granting a rehearing and recalling the mandate was made by a three-to-two vote of the Justices, one Justice being absent, not participating. The cause was carried over to this term on the petition for rehearing and recall of the mandate as was done in Helton v. State, above referred to.

In this case a party to the affirmed decree had a right to present a petition for rehearing as had been done in many other cases, and the province of the Court was to act on the petition. There were six Justices present, the petition was

granted three to two, one Justice not participating, as had been done in other cases. The cause was duly carried over to this term, and the Court has all the jurisdiction and power it had at a preceding term.

A re-argument should be allowed as in other cases, no matter what the decision may be.

This opinion was prepared before the order of March 28, 1938, was made by the Court.

BUFORD, J., concurs.

BROWN, J., concurs in conclusion.